IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES POWERS, on his own behalf and on behalf of the class defined herein, | : | CIVIL ACTION NO. 06-2993 |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE SAVAGE |
| | : | |
| LYCOMING ENGINES, a Division of AVCO Corporation; AVCO Corporation; and TEXTRON, INC., | : | |
| | : | |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

| | | |
|---|---|---|
| JOHN CAR, for himself and a class of Others similarly situated, | : | CIVIL ACTION NO. 06-4228 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE SAVAGE |
| | : | |
| LYCOMING ENGINES, a Division of AVCO Corporation; AVCO Corporation; and TEXTRON, INC., | : | |
| | : | |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

## (PROPOSED) ORDER
## GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

AND NOW, this _____ day of _____, 2007, upon consideration of

Plaintiffs' Motion, Memorandum of Law and accompanying exhibits, and Defendants' response

thereto, and oral argument, the Court hereby finds the following:

1.    *Numerosity.* The class, consisting of approximately 4,000 members located

throughout the United States, satisfies the numerosity requirement of Fed. R. Civ. P. 23(a).  The

Court of Appeals for the Third Circuit has found that if the potential number of plaintiffs exceeds

40, numerosity has been met. *See Stewart v. Abraham,* 275 F.3d 220, 226-27 (3d Cir. 2001).

Joinder of these widely-dispersed, numerous class members into one suit would be impracticable.

2. *Commonality.* Rule 23(a)(2)'s commonality requirement focuses on whether at least one common question of law or fact exists for the proposed class. *See Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir. 1994). Here, numerous common questions of law and fact with regard to Defendants' conduct exist for each of the class members in this case, including:

  a. Whether the subject crankshafts are unsafe;

  b. When Lycoming first knew about the unsafe nature of the subject crankshafts;

  c. Whether Lycoming omitted and/or failed to disclose to Plaintiffs and the class material facts concerning the unsafe nature of the subject crankshafts;

  d. Whether Lycoming had a duty to Plaintiffs and the class to disclose the unsafe nature of the subject crankshafts;

  e. Whether it would be inequitable for Lycoming to retain the conferred benefits without the payment of value to Plaintiffs and class members; and

  f. Whether Lycoming should be ordered to pay damages to Plaintiffs and the class.

These issues are central to the case and are sufficient to establish commonality.

3. *Typicality.* The threshold for establishing typicality is low, and will be satisfied as long as the factual or legal position of the named plaintiffs are not markedly different from that of the other members of the class. *See Seidman v. American Mobile Sys., Inc.,* 157 F.R.D. 354, 360 (E.D. Pa. 1994). Plaintiffs' claims arise from the same course of conduct that has

affected all class members: the design, marketing and sale of defective engines. In addition, Plaintiffs and all members of the class will pursue three common claims: negligence, violation of state unfair practices and consumer protection statutes and unjust enrichment. For these reasons, typicality has been met.

4. *Adequate Representation.* Plaintiffs' interests do not conflict with those of the absent class members and are co-extensive with the interests of absent class members, and Plaintiffs' counsel are competent to represent the class. The adequacy requirement is thus satisfied. *See Seidman,* 157 F.R.D. at 365. Correspondingly, to further insure adequacy, and in accordance with Fed. R. Civ. P. 23(g), the Court appoints the following six firms as Class Counsel: RodaNast, P.C.; Bailey Law Group, P.C.; Climaco, Lefkowitz, Peca, Wilcox & Garofoli, Co., L.P; Sheller, Ludwig & Sheller, P.C.; The Mills Law Group; and Levy, Ram & Olson, LLP. These firms have worked extensively to identify and investigate the claims in the action, are experienced in handling complex litigation, and have adequate financial resources to conduct this litigation.

5. *Predominance of Common Issues.* Common issues predominate in this case, where each class member will seek to remedy the same grievance: Lycoming's design, manufacture and sale of defective aircraft engines. Plaintiffs' choice of law analysis confirms that any differences in state laws are minimal, and the interest of Pennsylvania in applying its laws is greater than the interest of other states in applying their laws, such that the laws of Pennsylvania will be applied to all members of the class. *See Ratti v. Wheeling Pittsburgh Steel Corp.,* __ Pa. Super. __, 758 A.2d 695, 702 (2000).

6. *Superiority of the Class Action Mechanism.* The class action mechanism is ideally suited for the fair and efficient adjudication of this matter. Class certification promotes

efficiency and uniformity because it prevents class members from having to separately pursue claims in various courts around the country. Legal and factual issues in this case are similar as to each class member, other than the amount of individual damages, which does not preclude class treatment. No individual class member has an interest in individually pursuing a separate action, no litigation involving these class members has already been commenced, and a considerable amount of work has already been completed in this forum. The Court does not anticipate problems in the management of the class. The superiority requirement thus is satisfied. *See* Fed. R. Civ. P. 23(b)(3).

Accordingly, the Court, having found that all of the requirements of Fed. R. Civ. P. 23(a), (b)(3) and (g) have been satisfied, hereby ORDERS as follows:

1. The following litigation class is hereby certified pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure in Civil Action No. 06-2993, *Powers v. Lycoming Engines,* and in Civil Action No. 06-4228, *Car v. Lycoming Engines:*

> All persons and entities residing in any state other than the State of California who purchased before February 21, 2006, and either currently own or sold on or after February 21, 2006, a single or multi-engine aircraft that contains a (L)O-360, (L)IO-360, AEIO-360, AEIO-390, IO-390, O-540, IO-540, AEIO-540, (L)TIO-540, IO-580, AEIO-580 or IO-720 engine with a serial number listed in Lycoming Mandatory Service Bulletin 569A. Employees, officers, directors, legal representatives, heirs, successors and assignees of Defendants are excluded.

2. The following causes of action are included: (a) negligence; (b) violation of state consumer protection statutes; and (c) unjust enrichment. Pennsylvania law shall apply for all class members for all these claims.

3. Charles Powers and John Car are appointed Class Representatives.

4.     The following six firms are appointed Class Counsel: RodaNast, P.C.; Bailey Law

Group, P.C.; Climaco, Lefkowitz, Peca, Wilcox & Garofoli, Co., L.P; Sheller, Ludwig & Sheller,

P.C.; The Mills Law Group; and Levy, Ram & Olson, LLP.


**It is so ORDERED.**


Dated: _____, 2007          BY THE COURT:


                                          _____
                                          TIMOTHY J. SAVAGE, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES POWERS, on his own behalf and on behalf of the class defined herein, | : | CIVIL ACTION NO. 06-2993 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE SAVAGE |
| | : | |
| LYCOMING ENGINES, a Division of AVCO Corporation; AVCO Corporation; and TEXTRON, INC., | : | |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

| | | |
|---|---|---|
| JOHN CAR, for himself and a class of Others similarly situated, | : | CIVIL ACTION NO. 06-4228 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE SAVAGE |
| | : | |
| LYCOMING ENGINES, a Division of AVCO Corporation; AVCO Corporation; and TEXTRON, INC., | : | |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs move for an order granting certification for the class, approving Charles Powers and John Car as the Class Representatives, and appointing the following six firms as Class Counsel: RodaNast, P.C.; Bailey Law Group, P.C.; Climaco, Lefkowitz, Peca, Wilcox & Garofoli, Co., L.P; Sheller, Ludwig & Sheller, P.C.; The Mills Law Group; and Levy, Ram & Olson, LLP.

In support of this Motion, Plaintiffs incorporate the attached Memorandum of Law.

Dated:  October 16, 2006

Respectfully submitted,

*Michele S. Burkholder*

Joseph F. Roda (Pa. Bar No. 20615)
Dianne M. Nast  (Pa. Bar No. 24424)
Michele S. Burkholder (Pa. Bar No. 78063)
**RODANAST, P.C.**
801 Estelle Drive
Lancaster, PA 17601
Telephone: (717) 892-3000
Facsimile: (717) 892-1200

Kathy Bailey (Pa. Bar No. 43429)
**BAILEY LAW GROUP, P.C.**
1615 L Street, N.W., Suite 1350
Washington, D.C. 20036
Telephone: (202) 887-8040

John R. Climaco (*pro hac vice* to be filed)
Keith T. Vernon (*pro hac vice* to be filed)
**CLIMACO, LEFKOWITZ, PECA,**
**WILCOX & GAROFOLI, Co., LPA**
1220 Huron Road, Suite 1000
Cleveland, OH 44115
Telephone: (216) 621-8484

Robert W. Mills (pro hac vice to be filed)
Harry Shulman (pro hac vice to be filed)
**THE MILLS LAW FIRM**
145 Marina Boulevard
San Rafael, CA 94901
Telephone: (415) 455-1326

Jonathan Shub (Pa. Bar No. 53965)
TerriAnne Benedetto (Pa. Bar No. 59378)
**SHELLER, LUDWIG & SHELLER, P.C.**
1528 Walnut Street, Third Floor
Philadelphia, PA 19102
Telephone: 215-790-7300
Facsimile:  215-546-0942

Michael F. Ram (pro hac vice to be filed)
Erica L. Craven (pro hac vice to be filed)
**LEVY, RAM & OLSON, LLP**
639 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 433-4949

*Attorneys for the Plaintiffs and the Proposed Class*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES POWERS, on his own behalf and on behalf of the class defined herein, | : : : | CIVIL ACTION NO. 06-2993 |
| Plaintiff, | : : | |
| v. | : : | JUDGE SAVAGE |
| LYCOMING ENGINES, a Division of AVCO Corporation; AVCO Corporation; and TEXTRON, INC., | : : : : | |
| Defendants. | : | JURY TRIAL DEMANDED |

| | | |
|---|---|---|
| JOHN CAR, for himself and a class of others similarly situated, | : : : | CIVIL ACTION NO. 06-4228 |
| Plaintiff, | : : | |
| v. | : : | JUDGE SAVAGE |
| LYCOMING ENGINES, a Division of AVCO Corporation; AVCO Corporation; and TEXTRON, INC., | : : : : | |
| Defendants. | : | JURY TRIAL DEMANDED |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## I.  **INTRODUCTION**

It is undisputed that the crankshafts in at least 3,774 aircraft engines manufactured and sold by Defendants are defective and must be replaced.  Plaintiffs seeks to recover – for themselves and all members of the following Class – all costs associated with replacing the defective crankshafts and the diminished value of the aircraft:

> All persons and entities residing in any state other than the State of California who purchased before February 21, 2006, and either currently own or sold on or after February 21, 2006, a single or multi-engine aircraft that contains a (L)O-360, (L)IO-360, AEIO-360, AEIO-390, IO-390, O-540, IO-540, AEIO-540, (L)TIO-540, IO-580, AEIO-580 or IO-720 engine with a serial number listed in Lycoming Mandatory Service Bulletin 569A.  Employees, officers, directors, legal representatives, heirs, successors and assignees of Defendants are excluded.

## II.  **FACTUAL BACKGROUND**

### A.  **Crankshafts are reasonably expected to last the life of the aircraft.**

The crankshaft is a crucial part of the engine that translates the piston motion into rotation and turns the propeller.  Unlike other parts in an aircraft engine that must be replaced at regular "overhaul" maintenance intervals, crankshafts are reasonably expected to last the life of an aircraft with regular maintenance.  *See* Declaration of Ronald A Mangon, ¶ 7, attached as Exhibit 1.

Lycoming recommends that after every 2,000 hours of flying time or within twelve years, whichever occurs first, the engines at issue in these cases should be overhauled.  *See* Lycoming Service Instruction No. 1009AS, at 1, attached as Exhibit 2.  Crankshafts, however, are *not* typically replaced during an overhaul.  *See* Lycoming Mandatory Service Bulletin No. 240T, attached as Exhibit 3.

**B.** **Lycoming announces "early retirement" of its unsafe crankshafts.**

Contrary to what reasonable consumers, mechanics and aircraft owners expect — and what Lycoming itself has said — on February 21, 2006, Lycoming issued Mandatory Service Bulletin ("MSB") 569, attached as Exhibit 4, followed on April 11, 2006 by MSB 569A, attached as Exhibit 5, instituting an "early retirement" program for specific Lycoming crankshafts "hammer-forged by [its] previous supplier between 1997 and 2002." *See* April 11, 2006 Lycoming Letter, attached as Exhibit 6. Under Lycoming's "early retirement" program, aircraft owners were directed to replace their crankshafts at the next crankcase access (i.e., the next time the engine crankcase is separated to allow inspection or replacement of parts) or the next scheduled overhaul, but no later than February 21, 2009. *Id.*

MSB 569A was followed in May and September 2006 by a proposed and then final Airworthiness Directive ("AD") from the Federal Aviation Administration ("FAA") "to prevent failure of the crankshaft, which will result in total engine power loss, in-flight engine failure, and possible loss of the aircraft." *See* 71 Fed. Reg. 30078, at 30078 (May 25, 2006), attached as Exhibit 7, and 71 Fed. Reg. 57407, at 57407 (Sept. 29, 2006), attached as Exhibit 8. The FAA adopted the AD, having concluded an "unsafe condition exists" because "[t]he same metallurgical flaw that was found in 23 confirmed crankshaft failures in different groups of Lycoming 360 and 540 engines has been found in the crankshafts in this group of engines." 71 Fed. Reg. at 57408.

While the AD extends the time for aircraft owners to replace the crankshafts – to the time of the next engine overhaul, the next separation of the crankcase, or no later than twelve years from the time the crankshaft first entered service or was last overhauled, *id.* at 57407 – Lycoming has not supplemented or changed the shorter compliance date on Mandatory Service Bulletin 569A.

**C.** **Lycoming has known for years that its crankshafts are unsafe and likely to fail.**

Lycoming's 2006 "early retirement" program and the FAA's AD did not arise out of the blue. Lycoming has known for years that the crankshafts covered by MSB 569A (all produced pursuant to Lycoming designs, approved by Textron, at a specific supplier) will not last the life of the aircraft in which they are installed.

Starting in February 2002, after receiving several field reports of broken crankshafts, Lycoming issued MSB 550, which was superseded by MSB 552 in August 2002, attached as Exhibit 9. MSB 552 was then followed by Supplement 1 to MSB 552, attached as Exhibit 10. Those Mandatory Service Bulletins immediately grounded hundreds of aircraft with engines rated at 300 horsepower or higher until the crankshafts within them were replaced. *See* Exhibits 9 and 10. Lycoming claimed that the "suspect crankshafts" had a problem related to "material used in the crankshafts." *See* April 2002 Lycoming Update on Crankshaft Service Bulletin 550, attached as Exhibit 11.

Later that year, Lycoming issued MSB 553 and its supplement, attached as Exhibits 12 and 13, requiring the further inspection and possible replacement of the crankshafts in hundreds more 300-plus horsepower engines within the next 50 hours of operation or six months, whichever occurred first. The FAA mandated compliance by issuing an Airworthiness Directive. *See* 67 Fed. Reg. 59139-56, attached as Exhibit 14.

By the end of 2002, Lycoming had replaced almost 1,000 crankshafts. *See* July 11, 2005 Lycoming Letter, at 1, attached as Exhibit 15. Lycoming also implemented an extensive $35 million "Customer Care" program to "alleviate customer inconvenience" by paying to remove, ship and replace the unsafe crankshafts; to reinstall each affected consumers' engine; and for alternative transportation or fixed costs (including interest on loans, ground insurance and hangar

4

rental) and remote hangar fees. *See* January 7, 2003 Lycoming Immediate Release, at 1, attached as Exhibit 16.

This was not the end of the problem with the "suspect" crankshafts. Lycoming expected that more crankshafts were affected and would have to be recalled. *See, e.g.,* Textron Inc. 2002 Annual Report, at 21, attached as Exhibit 17 ("It is possible that additional engines outside of the current recall could potentially be affected"). Lycoming, however, concealed its knowledge from the class and vehemently denied that the recall would be extended to lower horsepower engines. *See, e.g.,* June 15, 2006 Letter from Cessna Pilots Association to FAA, at 1, attached as Exhibit 18.

Yet, three years later, Lycoming issued MSB 566 and its supplement, attached as Exhibits 19 and 20, requiring the replacement of crankshafts in more than 1,000 engines with 300 horsepower and below within the next 50 hours of operation or six months, whichever occurred first. The 2005 MSB and its supplement were issued in response to "the same [crankshaft] condition that prompted the 2002 Service Bulletins." *See* July 11, 2005 Letter, attached as Exhibit 21.

As in 2002, the FAA again issued Airworthiness Directives that mandated compliance. *See* 70 Fed. Reg. 54618 (Sept. 16, 2005), attached as Exhibit 22; 70 Fed. Reg. 76431 (Dec. 27, 2005), attached as Exhibit 23 (noting that the FAA investigation "into the crankshaft failures found that the failures result from subsurface metallurgical flaws, caused by lack of crankshaft process control"). And, as in 2002, Lycoming paid significant customer costs, including removal and reinstallation of the engines, inbound and outbound freight, and the cost of the crankshaft replacement. *See* Exhibit 21; November 30, 2005 Letter, attached as Exhibit 24. To cover those costs, Textron Inc. put aside an additional $8 million dollars to the remaining reserves from the prior recall program. *See* Textron 2005 Annual Report, at 70, attached as Exhibit 25.

Textron's 2005 Annual Report also disclosed that in the fourth quarter of 2005, Lycoming "developed a plan to institute a retirement program for approximately 5,100 crankshafts, representing the remaining crankshafts manufactured by the former supplier using the same forging technique as the crankshafts covered by prior service bulletins." *Id*. Textron put aside an additional $10 million to cover the "early retirement" costs, bringing the total reserve to cover costs directly related to the unsafe crankshafts to $32 million. *Id*.

**D.** **Lycoming changed tactics and has refused to pay costs associated with its Early Retirement Program and FAA Airworthiness Directive.**

When Lycoming issued MSB 569 and 569A in early 2006, forcing an "early retirement" of the crankshafts on owners, it was responding to the same crankshaft problem that had first been *publicly* identified in the 2002 recalls. Various groups have complained that Lycoming failed to come clean at the start, despite its knowledge in 2002 that "the flaws existed in the crankshafts in the lower horsepower engines," in order to phase the recall "roll out" to "spread out the cost and time to Lycoming and to get a significant portion of the fleet with flawed crankshafts beyond warranty." *See* Exhibit 18.

Moreover, unlike in the prior recalls, under MSB 569A Lycoming has *not* agreed to pay any of the costs associated with replacing the unsafe crankshafts. Lycoming will make no payments for labor to remove and reinstall the engine, no payments for shipping the engines to Lycoming's or another facility to have the crankshaft replaced, and no payments for alternative transportation or downed-plane costs.

The only exception is that Lycoming has agreed to provide a $2,000 "crankshaft and parts" kit for owners who replace the unsafe crankshafts before February 2009. *See* Exhibit 6. After February 2009, consumers will have to pay the full $16,000 cost of the crankshaft replacement kit. *Id*.

Similarly, on September 5, 2006 (soon after the filing of these lawsuits), Lycoming sent a letter reminding customers that if they pay the premium price to have their engines overhauled at Lycoming's facility in Pennsylvania, Lycoming's "usual 'no charge backs' core engine policy" would apply and the defective crankshaft would be replaced at no additional cost. *See* September 5, 2006 Letter, attached as Exhibit 26.

### E.  Lycoming's Early Retirement Program and FAA Airworthiness Directive impose significant costs on all class members.

MSB 569A and the related AD have imposed significant, unexpected and uncompensated costs on aircraft owners.  The FAA estimates the total cost of the AD, for *parts* only, to be well over $60,000,000.  *See* Exhibit 8, at 57409.  As addressed above, crankshafts are reasonably expected to last the life of the aircraft with regular maintenance.  *See* Exhibit 1, at ¶ 7, and Exhibit B thereto.  Yet, post-MSB 569A, aircraft owners who need to overhaul their engines in the near future will have to decide whether to pay a premium price to have their engines overhauled at Lycoming or pay extra out-of-pocket costs to have the crankshaft replaced at their preferred facility.

If owners who need an overhaul in the near future decide to have it performed at Lycoming, Lycoming has confirmed that crankshaft replacement is covered under its existing "core engine" policy.  *See* Exhibit 26.  However, Lycoming overhauls are frequently several thousand dollars more expensive than a comparable overhaul at another FAA-authorized facility. *See* Exhibit 1, at ¶¶ 8-9 (finding $5,000-9,000 difference for overhauls of Lycoming engines conducted at Lycoming versus other authorized facilities).[1]

--------------------------------------------------

[1] Unlike past recalls where Lycoming set up special assembly lines and staging areas devoted to replacing the unsafe crankshafts, *see* October 23, 2003 Release, attached as Exhibit 27, there is no evidence that Lycoming's facility will be able to handle the influx of crankshaft replacement/overhaul orders under MSB 569A, forcing substantial delays and significant down time on owners who choose to go with Lycoming. *See* Exhibit 1, at ¶ 12.

Also, owners who use their local or preferred FAA authorized facility to replace the unsafe crankshaft during an overhaul will have to bear the $2,000 cost for the replacement "crankshaft and parts kit" offered by Lycoming until February 2009. After that, owners will bear the full $16,000 cost. *See* Exhibit 26.

Owners who are not due for an overhaul for a significant number of years are faced with a Hobson's choice: continue flying in an aircraft with a crankshaft that Lycoming has admitted is "suspect" and "faulty," and that the FAA has deemed "unsafe"; or pay for the out-of-pocket costs of replacing the crankshaft now. For owners who are unwilling to take the risk of continued flight before taking action, replacement of the crankshafts will cost them in the range of $10,000 - $11,000 for all direct costs (including engine removal and reinstallation, shipping, and parts) if that replacement is done prior to February 2009, while the crankshaft replacement kit is $2,000, *see* Exhibit 1, at ¶¶ 2-5, and after that, the cost of parts alone will increase by $14,000. *See* Exhibit 26.

Such owners will also loss the use of their aircraft for several months, and as a result, they will be forced to pay the cost of traveling on available scheduled commercial aircraft or of chartering a commercial aircraft at $500 to above $5,000 an hour. Such owners will also incur other out-of-pocket expenses that include the amortized costs of hangar rental or ownership, aircraft insurance, periodic database updates for navigation, and FAA medical examination, as well as the depreciation and loss of use of the capital invested in the aircraft. *See* Exhibit 1, at ¶¶ 10-12.

Similarly, owners who sell their aircraft before an overhaul is due will be faced with the choice of paying out-of-pocket to replace the crankshaft, and losing the use of the aircraft while it is being repaired, or selling the aircraft with the unsafe crankshaft at a diminished price. *See* Exhibit 1, at ¶¶ 13-15.

For these reasons, Plaintiffs seek to have Lycoming – rather than named plaintiffs and the members of the class – pay the costs associated with the crankshaft replacement and the diminished value of the aircraft, due to its negligence in designing and selling the engines, its deceptive conduct in violation of various states' consumer protection statutes, and the need to prevent its unjust enrichment.

## III.    **ARGUMENT**

In determining whether to certify claims for classwide treatment, the Court should focus only on whether the requirements of Rule 23 have been satisfied. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974); *Sala v. National R.R. Passenger Corp.,* 120 F.R.D. 494, 495 (E.D. Pa. 1988). Courts should not evaluate whether the plaintiffs have stated a cause of action or will prevail on the merits, *Eisen,* 417 U.S. at 178; *Stewart v. Associates Consumer Discount Co.,* 183 F.R.D. 189, 193 (E.D. Pa. 1998), and should instead treat all substantive allegations of the Complaint as true. *Stewart,* 183 F.R.D. at 193.

The Rule 23 requirements should be given a liberal construction. *Stewart,* 183 F.R.D. at 194. Courts should resolve any doubts in favor of class certification, *Peil v. National Semi-conductor Corp.,* 86 F.R.D. 357, 364 (E.D. Pa. 1980), and "any error, if there is to be one, should be committed in favor of allowing the class action." *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir. 1985) (citations omitted).

To be entitled to class certification, a plaintiff must first satisfy the four threshold requirements of Rule 23(a), and then demonstrate that the action falls within at least one provision of Rule 23(b). *See Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir. 1994).

## A. The requirements of Rule 23(a) are satisfied.

Rule 23(a) provides the following four threshold requirements, commonly referred to as numerosity, commonality, typicality and adequacy of representation:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims . . . of the representative parties are typical of the claims . . . of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*See* Fed. R. Civ. P. 23(a); *Lake v. First Nationwide Bank,* 156 F.R.D. 615, 623 (E.D. Pa. 1994). Plaintiffs easily meet each of these prerequisites.

### 1. Numerosity is present.

Rule 23(a)(1) requires that a class be so numerous that it is impracticable to join all class members. To establish numerosity, a plaintiff must show only that joinder of all class members would be difficult or inconvenient, not impossible. *Sala,* 120 F.R.D. at 497.

Lycoming has listed the serial number of each crankshaft that must be replaced on pages 41 through 59 of MSB 569A, and there are 4,718 crankshafts included in that list. Plaintiffs thus believe that there are 4,718 members of the class. The FAA, on the other hand, has estimated in its Airworthiness Directive that this mandatory crankshaft "retirement" will affect 3,774 engines. Plaintiffs will investigate this discrepancy during discovery, but regardless of whether the class consists of 3,774 or 4,718 members, it would be impracticable for each member to maintain an individual lawsuit.

Courts in this district and the Third Circuit have consistently found the numerosity requirement satisfied by classes that are only a small fraction of the size of the class in this case. *See, e.g., Eisenberg,* 766 F.2d at 785-86 (more than 90 members); *Sala,* 120 F.R.D. at 497 (at least 40 to 50 members); *Zeffiro v. First Pa. Banking and Trust Co.,* 96 F.R.D. 567, 568-69 (E.D. Pa. 1983) (minimum 51 members).

In fact, Newberg has commented that "[i]n light of prevailing precedent, the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone." Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* (Thompson/West, 4th ed.) (2002) ("Newberg") § 3:5. *See also Stewart v. Abraham,* 275 F.3d 220, 226-27 (3d Cir. 2001) (citation omitted) ("No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.")

In cases such as this where thousands of class members are involved, the impracticability of joinder is obvious. *See Newberg* § 3:5. For these reasons, numerosity has been met in this action.

### 2.    Commonality is present.

Rule 23(a)(2) requires that there be questions of law or fact common to the class. A common question is one that "arises from a common nucleus of operative facts regardless of whether the underlying facts fluctuate over the class period and vary as to individual claimants." *In re Asbestos School Litig.,* 104 F.R.D. 422, 429 (E.D. Pa. 1984) (internal quotations and citations omitted), *aff'd in part and rev'd in part sub nom., In re School Asbestos Litig.,* 789 F.2d 996 (3d Cir. 1986).

The Court of Appeals for the Third Circuit has held that the "threshold of commonality is not high." *School Asbestos Litig.,* 789 F.2d at 1010 (citation omitted). Courts have opined that the liberal construction of this provision has resulted from the premise that in doubtful cases, the Court should favor the certification of the class. *See Asbestos School Litig.,* 104 F.R.D. at 428.

Rule 23(a)(2) does not require that all questions be common or even that common questions predominate. *Hummel v. Brennan,* 83 F.R.D. 141, 145 (E.D. Pa. 1979). In fact, the

commonality requirement may be satisfied by a single common issue of law _or_ fact. *Baby Neal,*

43 F.3d at 56; *see also Asbestos School Litig.,* 104 F.R.D. at 429.

In this case, Plaintiffs have alleged not just a single common issue, but several, including:

1.  Whether the subject crankshafts are unsafe;

2.  When Lycoming first knew about the unsafe nature of the subject crankshafts;

3.  Whether Lycoming omitted and/or failed to disclose to Plaintiffs and the class

material facts concerning the unsafe nature of the subject crankshafts;

4.  Whether Lycoming had a duty to Plaintiffs and the class to disclose the unsafe

nature of the subject crankshafts;

5.  Whether it would be inequitable for Lycoming to retain the conferred benefits

without the payment of value to Plaintiffs and class members; and

6.  Whether Lycoming should be ordered to pay damages to Plaintiffs and the class.

Any one of these common questions is sufficient to establish commonality in this action.

### 3. <u>Typicality is present.</u>

Rule 23(a)(3) requires that the claims of the representative parties be typical of the claims

of the class. The typicality requirement "is a safeguard against interclass conflicts, ensuring that

the named plaintiff's interests are more or less coextensive with those of the class." *Cumberland*

*Farms, Inc. v. Browning-Ferris Indus., Inc.,* 120 F.R.D. 642, 646 (E.D. Pa. 1988) (citing *Sley v.*

*Jamaica Water and Utilities, Inc.,* 77 F.R.D. 391, 394 (E.D. Pa. 1977)).

"The threshold for establishing typicality is low, and Rule 23(a)(3) will be satisfied as

long as the factual or legal position of the named plaintiff is not *markedly different* from that of

the other members of the class." *Seidman v. American Mobile Sys., Inc.,* 157 F.R.D. 354, 360

(E.D. Pa. 1994) (internal quotations and citations omitted) (emphasis added). "Typical is not

identical," and atypical elements of a claim may be adequately treated by using subclasses. *Id.* (citation omitted).

In this case, Plaintiffs' claims arise from the same course of conduct that has affected all members of the class: the design, marketing and sale of defective engines. In addition, Plaintiffs and all members of the class will pursue three common claims: negligence, violation of state unfair practices and consumer protection statutes and unjust enrichment.

As the claims of Plaintiffs and the class arise from the same course of conduct by Lycoming and are based on similar legal theories, typicality has been met.

### 4.     Adequacy of representation is present.

Rue 23(a)(4) requires that the representative party fairly and adequately protect the interests of the class. Adequate representation depends on two factors: (a) Plaintiffs' attorneys must be qualified, experienced and generally able to conduct the proposed litigation; and (b) Plaintiffs must not have interests antagonistic to those of the class. *Seidman,* 157 F.R.D. at 365.

The burden is on the defendant to demonstrate that the representation will be inadequate. *Sala,* 120 F.R.D. at 498; *In re Asbestos School Litig.,* 104 F.R.D. at 430.

As to the first factor, Plaintiffs are represented by highly experienced and skilled counsel whose abilities in the area of complex litigation have been repeatedly recognized by the courts. Plaintiffs' counsel possess substantial experience in class actions and other complex litigation, and are willing and able to prosecute this action fully and completely.[2]

As to the second prong, Plaintiffs and each member of the proposed class have a similar interest in seeing liability established against Lycoming. No conflicts of interest exist, as all

---

[2] The adequacy of Plaintiffs' counsel is further discussed in the context of the request for appointment of Lead Class Counsel. *See* Section III(C) below.

members of the class desire to recover as damages their costs associated with replacing the defective crankshafts, and the diminished value of the aircraft.

For these reasons, adequacy of representation has been met in this case.

## B. The requirements of Rule 23(b)(3) are satisfied.

Having satisfied the four prerequisites of Rule 23(a), Plaintiffs need only show that the requirements of one subsection of Rule 23(b) have been met for the claims to be certified for classwide treatment. *See Baby Neal,* 43 F.3d at 55. Plaintiffs seek certification under Rule 23(b)(3), which requires a showing of predominance and superiority. *Sala,* 120 F.R.D. at 498.

### 1. Predominance is present.

This rule requires only a "predominance of common questions, not a unanimity of them." *Rodriguez v. McKinney,* 156 F.R.D. 118, 119 (E.D. Pa. 1994) (citing *Sharp v. Coopers & Lybrand,* 70 F.R.D. 544, 547 (E.D. Pa. 1976), *aff'd,* 649 F.2d 175 (3d Cir. 1981)).

As long as the claims of class members are not in conflict with each other, class members need not be identically situated and may have individualized issues. *See O'Keefe v. Mercedes-Benz USA, LLC,* 214 F.R.D. 266, 290 (E.D. Pa. 2003) (citing *Kline v. Security Guards, Inc.,* 196 F.R.D. 261, 272 (E.D. Pa. 2000)). "The question is whether the class is cohesive enough to warrant adjudication by representation." *Fisher v. Virginia Elec. and Power Co.,* 217 F.R.D. 201, 213 (E.D. Va. 2003).

Common questions clearly predominate in this case, where each class member will seek to remedy the same grievance: Lycoming's design, manufacture and sale of defective aircraft engines.

While Lycoming may argue that this case cannot be certified because it involves claims of class members from different states, a conflict of law analysis reveals that this presents no true obstacles to certification.

"In Pennsylvania, choice of law analysis first entails a determination of whether the laws of the competing states actually differ. If not, no further analysis is necessary. If [the Court] determine[s] a conflict is present, [the Court] must then analyze the governmental interests underlying the issue and determine which state has the greater interest in the application of its law." *Ratti v. Wheeling Pittsburgh Steel Corp.,* __ Pa. Super. __, 758 A.2d 695, 702 (2000) (citations omitted).

### a.    <u>Pennsylvania law applies to the negligence claim.</u>

"In Pennsylvania, the elements of a cause of action based upon negligence are: (1) a duty or obligation recognized by the law requiring the defendant to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) defendant's failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; (4) actual loss or damage resulting to the plaintiff." *R.W. v. Manzek*, 585 Pa. 335, 346, 888 A.2d 740, 746 (2005).

Plaintiffs have conducted a detailed analysis of the negligence laws in the remaining 49 states and have set forth the requirements for each law in the chart attached as Exhibit 28. The attached chart reveals that the negligence laws in all other jurisdictions in this country contain the same essential elements as the negligence law in Pennsylvania: (1) duty; (2) breach; (3) cause; and (4) harm. *See* Exhibit 28.

Plaintiffs' analysis of the negligence laws is consistent with this Court's prior holding in *Asbestos School Litigation,* 104 F.R.D. 422. In that action, this Court granted certification on all claims, including a negligence claim, for a nationwide class, holding that "as to negligence, 51

jurisdictions are in virtual agreement in that they apply the Restatement (Second) of Torts,

§ 388." *Id.* at 434. The United States Court of Appeals for the Third Circuit affirmed that

decision. *School Asbestos Litig.,* 789 F.2d 996.

Other courts have subsequently cited to *Asbestos School Litigation* and come to the same

conclusion. *See, e.g., In re Telectronics Pacing Sys., Inc.,* 164 F.R.D. 222, 230 (S.D. Ohio 1995)

("The definition of negligence . . . is substantially identical in all jurisdictions. All fifty-one

jurisdictions in the United States are in virtual agreement as to negligence in that they apply the

Restatement (Second) of Torts § 388.") *See also In re Prudential Ins. Co. America Sales*

*Practices Litig. Agent Actions,* 148 F.3d 283, 315 (3d Cir. 1998) (certifying a nationwide class in

an action that included a negligence claim after reviewing an analysis and comparison of state

laws); *In re Metropolitan Life Ins. Co. Sales Practices Litig.,* MDL 1091, 1999 WL 33957871, at

*23 (W.D. Pa. Dec. 28, 1999) (certifying a nationwide class in an action claiming negligence). [3]

As the laws of the competing states do not differ in any material aspect, no further

analysis is necessary. *See Ratti,* 758 A.2d at 702. Pennsylvania negligence law should apply to

all class members.

---

[3] Plaintiffs anticipate that Lycoming may cite *In the Matter of Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir. 1995) in opposition to certification of the negligence claim. In *Rhone-Poulenc,* the Court of Appeals for the Seventh Circuit directed the district court to decertify a mass tort class action relating to the manufacture of a drug allegedly causing hemophiliacs to become infected with the HIV virus. The Court said that "at some level of generality the law of negligence is one, not only nationwide but worldwide," but nonetheless ordered decertification, citing novel issues relating to the "serendipity" theory and varying standards of care for medical providers. *Id.* at 1300-1302. That decision is distinguishable in that neither the "serendipity" theory nor medical provider duties are involved in this action. That decision also has been sharply criticized as incorrect and motivated by a philosophical disagreement with the effects of Rule 23. *See, e.g., Telectronics,* 164 F.R.D. at 230; *In re Copley Pharmaceutical, Inc.,* 161 F.R.D. 456, 458-61 (D. Wyo. 1995); *Cook v. Rockwell Internat'l Corp.,* 181 F.R.D. 473, 477 (D. Colo. 1998). That decision also is contrary to the Third Circuit's opinion in *School Asbestos Litig.,* 789 F.2d 996.

        **b.**       **<u>Pennsylvania law applies to the state consumer protection law</u>**
                **<u>claims.</u>**

Pennsylvania's consumer protection law is the Unfair Trade Practices and Consumer

Protection Law. *See* 73 Pa. Cons. Stat. §§ 201-1 – 209-9.3. The statute precludes "unfair or

deceptive acts or practices," 73 Pa. Cons. Stat. § 201-3, including the act of "engaging in any . . .

deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa.

Cons. Stat. § 201-2(4)(xxi). Subparagraph (xxi) is commonly known as the "catchall" provision.

Any individual or corporation who is injured by a violation of the statute after purchasing

a good primarily for personal, family or household purposes may bring an action for the greater

of actual damages or $100, treble damages in excess of $100, attorneys' fees, costs and equitable

relief. *See* 73 Pa. Cons. Stat. § 201-9.2(a) (creating a private right of action and listing

remedies); 73 Pa. Cons. Stat. § 201-2(2) (defining "person"). Relief may be pursued in a class

action. *See, e.g., Foultz v. Erie Ins. Exch.,* No. 3053 Feb. Term 2000, 2002 WL 452115, at **11-

12 (Pa. C.P. Lancaster County Mar. 13, 2002).

Claims under the "catchall" provision do not require a showing of scienter. *Compare* 73

Pa. Cons. Stat. § 201-2(4)(xxi) (including no references to "intent" or acting "knowingly") *with*

73 Pa. Cons. Stat. § 201-2(4)(ix), (x) (including references to "intent") *and* 73 Pa. Cons. Stat.

§ 201-2(4) (xv) (including reference to acting "knowingly").

The "catchall" provision also does not require a showing of reliance. *See Hunt v. United*

*States Tobacco Co.,* No. 06-1099, 2006 WL 2619806, at *2 (E.D. Pa. Sept. 11, 2006); *Foultz,*

2002 WL 452115, at **11-12; *Weiler v. SmithKline Beecham Corp.,* No. 2422, 53 Pa. D.&C.4th

449, 2001 WL 1807382, at **2-3 (Pa. C.P. Lancaster County Oct. 8, 2001).[4]

---

[4] While a number of opinions have held that reliance is required under the "catchall" provision,
all are inapplicable. For example, in *Booze v. Allstate Ins. Co.,* __Pa. Super. __, 750 A.2d 877,
880 n.6 (2000), the Court said that it had applied the pre-1996 "catchall" provision, which did

Plaintiffs have analyzed each state's consumer protection statute and have set forth the

elements of each law in the chart attached as Exhibit 29. The analysis reveals some variations in

the consumer protection laws of Pennsylvania and other states, including the following:

(1)     One state does not allow private causes of action. (Iowa).

(2)     Two states do not allow private causes of action for a corporation. (Alaska and Kansas).

(3)     Five states do not allow class actions. (Alabama, Louisiana, Mississippi, Montana, South Carolina).

(4)     Three states require a showing of reliance. (Arizona, Indiana and Wyoming).[5]

(5)     Ten states require a showing of scienter. (Colorado, Illinois, Minnesota, Nevada, New Jersey, North Dakota, Oregon, South Dakota, Utah and West Virginia).

See Exhibit 29.

As there are genuine conflicts between the consumer protection statute of Pennsylvania

and the statutes of other states, an analysis of the governmental interests underlying the statutes

must be performed to determine which state has the greater interest in the application of its law.

See Ratti, 758 A.2d at 702.

---

not yet include a prohibition against "deceptive conduct." Two opinions subsequently relied on *Booze. See In re Patterson*, 263 B.R. 82, 91-92 (E.D. Pa. 2001) (saying the *Booze* court must have misspoke when it cited to the pre-1996 "catchall" provision, even though *Booze* related to acts from the 1980s); *In re N Phenylpropanolamine Litig.*, No. 0001, Sept. Term 2001, 2002 WL 244858, at *2 (Pa. C.P. Lancaster County Feb. 5, 2002). Another court relied on *Booze* and another opinion that relied on pre-1996 cases. *See Dawson v. Dovenmuehle Mortgage, Inc.*, No. A.00-6171, 2002 WL 501499, at *6 (E.D. Pa. Apr. 3, 2002) (citing *Booze* and *Fisher v. Aetna Life Ins. & Annuity Co.*, 39 F. Supp.2d 508, 511 n.2 (M.D. Pa. 1998)). While one post-1996 opinion noted that the Act's legislative history did not indicate an intent to drop the reliance requirement found at common law, the opinion cited to the legislative history from twenty years before adoption of the "catchall" amendment, from 1975 and 1976, *Weinberg v. Sun Co.*, 565 Pa. 612, 618, 777 A.2d 442, 446 (2001), and was reviewing application of the Act's false advertising provisions, rather than its "catchall" provision. *Id.* at 615, 777 A.2d at 444.

[5] The attached chart mistakenly says that the Minnesota statute requires reliance, when in fact the cited case holds that it does not.

The Pennsylvania Legislature enacted this state's consumer protection statute to protect the public from, and to eradicate, unfair or deceptive business practices, and to accomplish this, courts should liberally construe the provisions of the statute. *Agliori v. Metropolitan Life Ins. Co.,* 2005 Pa. Super. 253, 879 A.2d 315, 318 (2005) (citing *Commonwealth of Pennsylvania v. Monumental Props.,* 459 Pa. 450, 457-61, 329 A.2d 812, 815-17 (1974)).

Lycoming's principal place of business is in Pennsylvania. Lycoming issues its Service Instructions and Service Bulletins from its Pennsylvania office. *See, e.g.,* Exhibits 2-5, 9-10, 12-13, 19-20. Lycoming communicates with class members through telephone and facsimile lines in Pennsylvania. *See, e.g.,* Exhibits 4 at 3, 5 at 4, 9 at 1, 11, 12 at 1, 15, 19 at 3, 20 at 3, 21, 24, 26. Lycoming sends mail to class members from its Pennsylvania office. *See, e.g.,* Exhibits 6, 11, 15, 21, 24, 26. Lycoming sends press releases from Pennsylvania. *See, e.g.,* Exhibit 27. Lycoming also plans to replace crankshafts at its Pennsylvania office. *See* Exhibit 26. Pennsylvania thus has the greatest interest in the application of its laws to this defendant.

Pennsylvania's interest in eradicating unfair and deceptive business practices would be materially advanced by a class action in Pennsylvania aimed at stopping a company that has been primarily performing its unfair and deceptive acts from its Pennsylvania office. The statute does not limit the right to private actions to residents of Pennsylvania, *see* 73 Pa. Cons. Stat. § 201-9.2(a), and there is no justification for denying its protections to consumers from other states, especially when those consumers are being harmed by a company acting in this state.

The consumer protection laws of the other states similarly have been overwhelming designed to protect the public[6] and prevent unfair or deceptive practices.[7] It is difficult to see

---

[6] *See* Exhibit 29, entries for Alabama, Arkansas, Connecticut, Delaware, Florida, Idaho, Illinois, Indiana, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Montana, Nebraska, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin and Wyoming.

how those purposes would be thwarted by allowing consumers to pursue relief in this class action under Pennsylvania's consumer protection law.

While a small number of state statutes are instead focused on ensuring an equitable relationship between consumers and persons engaged in business,[8] and providing uniformity of the law in the area of unfair practices,[9] there are no material differences between the laws of those states and that of Pennsylvania. All allow individuals or corporations to pursue relief through a class action, and none require scienter or reliance.[10] In addition, those purposes would not be thwarted by allowing residents of those states to pursue relief through Pennsylvania's consumer protection law.

For similar reasons, courts in this and other states have applied their own consumer protection statutes to all members of nationwide classes. *See, e.g., Cullen v. Whitman Med. Corp.,* 188 F.R.D. 226, 235-36 (E.D. Pa. 1999); *Internat'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.,* No. ATL-L-3015-03, 2005 WL 2205341 (N.J. Sup. Ct. Law Div. July 29, 2005), *aff'd,* 384 N.J. Super. 275, 894 A.2d 1136 (2006), *motion for leave to appeal granted,* 188 N.J. 215, 902 A.2d 1232 (2006); *In re: St. Jude Med., Inc. Silzone Heart Valves Liability Litig.,* MDL No. 01-1396 (JRT/FLN), Document 443 (D. Minn. Oct. 13, 2006).

---

[7] *See* Exhibit 29, entries for Alaska, Arizona, Colorado, District of Columbia, Kentucky, Mississippi and Missouri.

[8] *See* Exhibit 29, entries for Massachusetts, New Hampshire and Virginia.

[9] *See* Exhibit 29, entry for Georgia.

[10] *See* Exhibit 29, entries for Georgia, Massachusetts, New Hampshire and Virginia.

### c. In the alternative, common issues would still predominate through the use of subgroups.

If the Court disagrees with the above analysis, and determines that each class member must be subjected to the consumer protection statutes of their states of residence, common issues would still predominate.

Plaintiffs would voluntarily dismiss the consumer protection claims for all class members who reside in Alabama, Iowa, Louisiana, Mississippi, Montana and South Carolina, as well as for all corporate class members who reside in Alaska and Kansas, because such class members would be prohibited from pursuing relief for such claims through a class action. *See* Exhibit 29. In such instance, for purposes of this one claim only, the class would be represented by only one Class Representative, Charles Powers, because John Car is a South Carolina resident.

Plaintiffs likewise would voluntarily dismiss the consumer protection claims for all class members who reside in Arizona, Indiana and Wyoming, because such class members would need to prove individual reliance, *see* Exhibit 29, and their individual issues could thus predominate over common issues.

The only material difference remaining between the statute in Pennsylvania and the statutes in the other states would be the requirement for proving scienter in Colorado, Illinois, Minnesota, Nevada, New Jersey, North Dakota, Oregon, South Dakota, Utah and West Virginia. This can easily be managed by including a special interrogatory, asking the jury to state whether scienter has been established. If scienter is established, class members in all states will be subject to the same liability ruling. If scienter is not established, class members in these ten states will receive an adverse verdict against them.

The consumer protection laws of the 28 remaining states – Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Kentucky, Maine, Maryland,

Massachusetts, Michigan, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, Ohio, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and Wisconsin – are essentially the same as the consumer protection law of Pennsylvania, allowing individuals and corporations to pursue relief through a class action, and to recover without a showing of scienter or individual reliance. Thus, all liability issues for all these class members could be determined on a common basis.

Courts in Pennsylvania have advocated such use of subclasses in support of allowing certification for a multi-state class pursuing relief under state consumer protection statutes. *See, e.g., Foultz,* 2002 WL 452115, at *10.

> **d.** **Pennsylvania law applies to the unjust enrichment claims, or in the alternative, differences in state unjust enrichment laws can be addressed through the use of subclasses.**

In Pennsylvania, a plaintiff alleging that a defendant has been unjustly enriched must establish the following: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under circumstances making it inequitable for the defendant to retain the benefit without paying for the value of the benefit. *See Commonwealth v. TAP Pharmaceutical Prods., Inc.,* __ Pa. Commw. __, 885 A.2d 1127, 1137 (2005) (citation omitted). The law does not require that the defendant intentionally obtain the benefit or commit fraud. *Id.*

Plaintiffs have analyzed each state's consumer protection statute and have set forth the elements of each law in the chart attached as Exhibit 30. The analysis reveals some variations in the unjust enrichment laws of Pennsylvania and other states, including the following:

(1)   Four states require that the defendant act with intent or fraud. (Alabama, Missouri, Ohio and Texas).

(2)   Three states require that the plaintiff expect remuneration at the time he confers the benefit. (New Jersey, Texas, Wyoming).

(3) One state requires that the plaintiff be obligated to pay, and pay, the debt of another, without receiving consideration or benefit in exchange. (Georgia).

*See* Exhibit 30.

As there are genuine conflicts between the unjust enrichment law of Pennsylvania and the laws of other states, an analysis of the governmental interests underlying the statutes must be performed to determine which state has the greater interest in the application of its law. *See Ratti,* 758 A.2d at 702.

As addressed on page 19, Lycoming has primarily acted and failed to act in relation to the members of this class in Pennsylvania, and Pennsylvania thus has the greatest interest in the application of its laws. Across the board, in each jurisdiction, including Pennsylvania, the doctrine of unjust enrichment is intended to prevent an injustice or inequity. *See* Exhibit 30.

Pennsylvania's interest in preventing injustice would be furthered by allowing all class members, regardless of their states of residence, to receive equitable relief in this action pursuant to the doctrine of unjust enrichment. Requiring the plaintiffs from certain states to jump through additional hoops to prove intent, expected remuneration or a debt payment obligation would thwart that interest, by allowing the defendants to retain benefits that belong instead to class members. No state has an interest in allowing a defendant to retain benefits belonging to another. This Court thus should apply Pennsylvania unjust enrichment law to the claims of all class members.

If the Court disagrees and determines that class members must be subjected to the unjust enrichment laws of their states of residence, Plaintiffs would voluntarily dismiss the claims for all class members who reside in Georgia, New Jersey, Texas and Wyoming, because expected remuneration and debt payment obligations are not at issue here.

However, the dissimilarity with the four states that require a showing that the defendant acted with intent can be addressed by using a special interrogatory that asks the jury to state whether the defendant's intent has been established. If intent is established, class members in all states will be subject to the same liability ruling. If intent is not established, class members in these four states will receive and adverse verdict against them.

The unjust enrichment laws in the remaining 41 states – Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia and Wisconsin – are essentially the same as the unjust enrichment law of Pennsylvania, and all liability issues for the class members in those states thus could be determined on a common basis.

e.     <strong><u>Individual issues involving damages does not preclude class certification.</u></strong>

The only significant aspect of this case that is not common for all class members is the amount of damages. "However, it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate." *Sala*, 120 F.R.D. at 499 (internal quotations and citation omitted); *see also Seidman*, 157 F.R.D. at 366.

<strong>2.     <u>Superiority is present.</u></strong>

Superiority must be considered from the points of view of the judicial system, the potential class members, the named plaintiffs, the attorneys, the public at large, and the defendant. *Sala,* 120 F.R.D. at 499. Class actions serve their intended function when they

prevent a multiplicity of suits, or when the economics of the situation would otherwise make it impossible for each aggrieved member to vindicate his or her rights by a separate action. *Id.* at 499-500.

The proposed class consists of at least 3,774, and up to 4,718, persons who purchased a defective engine with their aircraft. If these cases were tried separately, the same evidence would have to be presented thousands of times to resolve the same issues. This would not be in the best interests of the Court, the parties, the attorneys, or the general public.

Rule 23(b)(3) lists several additional matters that are pertinent to this analysis, including the interest of class members in individually pursuing separate actions, the extent and nature of any litigation that has already been commenced, the desirability of concentrating the litigation in the requested forum, and the difficulties likely to be encountered in the management of a class action. All of these matters favor class certification of the state claims.

Plaintiffs are aware of no one who prefers to pursue a separate action for his or her claims, and in fact, without a class action, potential class members likely would have no realistic means of seeking a recovery for their claims. Plaintiffs have carved out California consumers from the class definition, and are aware of no other litigation that has already been commenced for the remaining class members. Concentrating the litigation in this forum is also desirable, where a considerable amount of the work has already been completed. Finally, Plaintiffs foresee no difficulties likely to be encountered in the management of this class action. For these reasons, superiority has been met.

## C.     Proposed Class Counsel meet the requirements for Rule 23(g) appointment.

A Court that certifies a class must appoint class counsel, who is charged with fairly and adequately representing the interests of the class. Fed. R. Civ. P. 23(g)(1)(A)-(B).

In appointing class counsel, the Court must consider: (1) the work class counsel has done in identifying or investigating potential claims in this action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(C)(i). The Court may also consider any other matters pertinent to counsel's ability to fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(g)(1)(C)(ii).

As described in the attached Firm Biography, RodaNast, P.C. has substantial experience handling class actions and complex litigation, and has held leadership positions in dozens of class actions. *See* Exhibit 31. Similarly, Roda Nast's co-counsel – Bailey Law Group, P.C.; Climaco, Lefkowitz, Peca, Wilcox & Garofoli, Co., L.P; Sheller, Ludwig & Sheller, P.C.; The Mills Law Group; and Levy, Ram & Olson, LLP – each have substantial litigation experience. *See* Exhibits 32 through 36.

Proposed Class Counsel are familiar with the applicable laws, and have expended significant effort in investigating this case, developing facts to support the allegations in the case, and developing legal theories to support the claims asserted in the Complaints. Proposed Class Counsel are committed to prosecuting this case and have the resources necessary to adequately represent the class.

As such, Plaintiffs assert that Proposed Class Counsel satisfy the dictates of Rule 23(g) and would fairly and adequately represent the interests of the class. The Court should appoint them as Class Counsel in this litigation.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order: (1) granting Plaintiffs' motion for class certification; (2) approving Charles Powers and John Car as

26

the Class Representatives; and (3) appointing the following six firms as Class Counsel:

RodaNast, P.C.; Bailey Law Group, P.C.; Climaco, Lefkowitz, Peca, Wilcox & Garofoli, Co.,

L.P; Sheller, Ludwig & Sheller, P.C.; The Mills Law Group; and Levy, Ram & Olson, LLP.


Dated: October 16, 2006

Respectfully submitted,

*Michele S. Burkholder*

Joseph F. Roda (Pa. Bar No. 20615)
Dianne M. Nast  (Pa. Bar No. 24424)
Michele S. Burkholder (Pa. Bar No. 78063)
**RODANAST, P.C.**
801 Estelle Drive
Lancaster, PA 17601
Telephone: (717) 892-3000
Facsimile: (717) 892-1200

Kathy Bailey (Pa. Bar No. 43429)
BAILEY LAW GROUP, P.C.
1615 L Street, N.W., Suite 1350
Washington, D.C. 20036
Telephone: (202) 887-8040

John R. Climaco (*pro hac vice* to be filed)
Keith T. Vernon (*pro hac vice* to be filed)
**CLIMACO, LEFKOWITZ, PECA,**
**WILCOX & GAROFOLI, Co., LPA**
1220 Huron Road, Suite 1000
Cleveland, OH 44115
Telephone: (216) 621-8484

Robert W. Mills (*pro hac vice* to be filed)
Harry Shulman (*pro hac vice* to be filed)
**THE MILLS LAW FIRM**
145 Marina Boulevard
San Rafael, CA 94901
Telephone: (415) 455-1326

Jonathan Shub (Pa. Bar No. 53965)
TerriAnne Benedetto (Pa. Bar No. 59378)
**SHELLER, LUDWIG & SHELLER, P.C.**
1528 Walnut Street, Third Floor
Philadelphia, PA 19102
Telephone: 215-790-7300
Facsimile:  215-546-0942

Michael F. Ram (*pro hac vice* to be filed)
Erica L. Craven (*pro hac vice* to be filed)
**LEVY, RAM & OLSON, LLP**
639 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 433-4949

*Attorneys for the Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Plaintiff's Motion for Class Certification and memorandum in support thereof was filed electronically and is available for review on the Court's ECF system. In addition, I have today caused to be served via first class mail, postage prepaid, a true and correct copy of Volumes I and II of the Exhibits to Plaintiffs' Memorandum on the following:

Catherine B. Slavin, Esquire
**COZEN O'CONNOR**
1900 Market Street
Philadelphia, PA 19103
*Attorney for Defendants*

Richard J. Bedell, Jr., Esquire
**JONES DAY**
North Point, 901 Lakeside Avenue
Cleveland, OH 44114
*Attorney for Defendants*

Kathy D. Bailey
**BAILEY LAW GROUP, P.C.**
1615 L Street, N.W., Suite 1350
Washington, D.C. 20036
*Attorney for Plaintiffs*

John R. Climaco, Esquire
Keith T. Vernon, Esquire
**CLIMACO, LEFKOWITZ, PECA,
WILCOX & GAROFOLI, Co., LPA**
1220 Huron Road, Suite 1000
Cleveland, OH 44115
*Attorneys for Plaintiffs*

Michael F. Ram
Erica L. Craven
**LEVY, RAM & OLSON, LLP**
639 Front Street, 4th Floor
San Francisco, CA 94111
*Attorneys for Plaintiffs*

Robert W. Mills
Harry Shulman
**THE MILLS LAW FIRM**
145 Marina Boulevard
San Rafael, CA 94901
*Attorneys for Plaintiffs*

Jonathan Shub
TerriAnne Benedetto
**SHELLER, LUDWIG &
SHELLER, P.C.**
1528 Walnut Street, Third Floor
Philadelphia, PA 19102

DATED: October 16, 2006

MICHELE S. BURKHOLDER